UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 1:18-cv-23576-KMW

AM GRAND COURT LAKES LLC &
AM 280 SIERRA DRIVE LLC,

    Plaintiffs,

v.

ROCKHILL INSURANCE COMPANY,

    Defendant.
_____/

## PLAINTIFFS' MOTION FOR DIRECTED VERDICT AND ENTRY OF FINAL JUDGMENT AND PLAINTIFFS' RESPONSE TO THE DEFENDANT'S MOTION FOR DIRECTED VERDICT

COMES NOW, the Plaintiffs, AM Grand Court Lakes and AM 280 Sierra Drive, by and through undersigned counsel and pursuant to Fed. R. Civ. P. 50 and 54, and hereby state as follows in support of their Motion for Directed Verdict and Entry of Final Judgment, and Response to the Defendant's Motion for Directed Verdict. **[D.E. 198]**.

1. On November 22, 2019, the Jury entered a special verdict which established that the Defendant breached the subject contract of insurance by not paying $9,280,000.00 in covered damages. *See Question 1 and 4 of Verdict Form*. **[D.E. 202]**.

2. Prior to resting their respective cases, and with the Court reserving jurisdiction on the matter, both the Plaintiffs and the Defendant moved for a directed verdict pursuant to Rule 50.

3. In relation thereto, and in support of the Plaintiffs' position that the Jury's findings relating to coverage were legally and factually sound, and that it was evidenced without genuine

1

evidentiary dispute that the compensatory damages equated to at least the Policy limits of $15,512,500, the undisputed evidence at trial provided as follows.

*(1.)* The "Policy" of insurance simply required the Plaintiffs to prove by the greater weight of the evidence that the physical damages to the "Insured Structures" arose during the Policy period **[D.E. 29-1]**. *See Phoenix Insurance Co. v. Branch*, 234 So.2d 396 (Fla. 4th DCA 1970) ("Recovery under an 'all risks' policy generally extends to all losses not resulting from misconduct or fraud unless the policy contains a specific provision expressly excluding the loss from coverage. Once the insured establishes a loss apparently within the terms of an "all risks" policy, the burden shifts to the insurer to prove that the loss arose from a cause which is excepted."); *B & S Assocs., Inc. v. Indem. Cas. & Prop., Ltd.*, 641 So. 2d 436, 437 (Fla. 4th DCA 1994). ("Coverage should be extended under an all-risks insurance policy, even when the cause of the damage is unknown.") At said point, the burden shifted upon the Defendant to establish that in part or in whole the proven damages were efficiently and proximately caused by an excluded cause of loss. *Id.*

(2.) The Plaintiffs met the stated burden of proof by way of the following:

(a.) At the behest of the Defendant's counsel at trial, the jury was presented with the affidavits of the Plaintiffs' retained experts, which included Alfredo Brizuela, P.E., a forensic engineer and general contractor who fully detailed therein and by way of live testimony that the forces of wind related to Hurricane Irma were of such a nature that openings throughout the exterior envelope (i.e. roof, exterior walls and floors, exterior windows and doors, catwalks, intersects between the walls and unit specific air conditioning units) had consumed the vast majority of the Insured Structures' 164,000 square feet. As established by way of hundreds of hours of diagnostic tests and inspections, the conditions were such that 80% of the exterior and interior components

of the Insured Structures were exhibiting elevated, toxic and corrosive moisture conditions. Further, and as opposed to performing partial or piecemeal repairs of the exterior, structural and interior components of the Insured Structures, he opined that it was readily apparent that the most efficient and economic means of repair provided for the demolition and reconstruction of the Insured Structures. In serving his function as an engineer, Mr. Brizuela testified that he was obligated to consider "economic value" of the opined upon course and scope of repair.

(b.) The opinions of Mr. Brizuela were also supported by the affidavits (which were entered into evidence at the request of Defendant's counsel **[D.E. 192]** and **[D.E. 203]**) and testimony of the Plaintiffs' two other experts, Sergio Arce and Alain Gonzalez, the latter of which had significant experience in building and rebuilding assisted living facilities such as the one in question.  As is commonplace for a general contractor when bidding for or pricing a construction project such as the one in question, Mr. Gonzalez attested to in certain terms that the accepted means of so doing in the industry was to draw the valuation on a square foot basis and the market place's usual and customary charges and reimbursement rates.  Like Mr. Brizuela, Mr. Gonzalez had significant training, education and experience in relation to building and rebuilding medical facilities such as the one in question, and even on the most conservative end, Mr. Gonzalez stated that the rebuild cost for the Insured Structures exceeded $300 per square foot.  Even at $100 per square foot, which as a function of common sense or knowledge would fall far below the cost of tearing down and rebuilding the Insured Structures, the opined upon course and scope of repair would exceed the $15,512,500 in coverage that was at issue for the agreed upon insured value as set forth in the Policy. The collective opinions as stated were the subject of prior rulings in this case which

now run inapposite to the Defendant's conclusory and unsubstantiated by law, fact or reasons argument, that a general contractor and/or engineer cannot opine that the repairs to the Insured Structures (5 buildings) cannot be calculated on a per square foot basis as generally provided for as the accepted valuation means in the marketplace – which no evidence was presented by the Defendant to support a contrary conclusion.

(c.) As to whether the Defendant in turn met its burden of establishing the damages at issue were excluded or simply not so as attested to by all three of the Plaintiffs' experts, the Defendant's very own engineer, Mr. Philmon, testified at trial that in the course of approximately 4 hours he had **"seen enough"** during his inspection, and that there was no question that the Insured Structures were water damaged from **"top to bottom."** Although at trial he attempted at one point to opine, for the first time, that all the water damages were due to defective and unit specific air conditioning units or windows, he readily admitted during cross-examination that he was not positioned to opine as to whether in fact the air conditioning units or windows failed in relation to any particular excluded cause or loss, or that they were the efficient proximate cause of the extensive water damages that he conveyed in poignant terms as being pervasive throughout the Insured Structures.  Rather, he testified at trial that: (1.) the scope of his retention as an expert was limited to his visible observations and the extent of roof damages and corresponding repairs; (2.) he did not perform any diagnostic moisture assessments in order to account for the scope and value of repair in relation to the pervasive and systemic building system failures that allowed obvious and "top to bottom" water damages; (3.) he only accounted for patent visible damages due to wind, and in so doing, did not account to what to degree there were concurring causes of loss that were latent in nature and coinciding with wear and tear-which is the only excluded cause of

loss that was generally alluded to; and (4.) aside for some very limited areas (which clearly accounted for less than 1% of the total area at issue which exceeded 31 miles of enclosed and covered areas) whereat he saw visible indicators of conditions that could be related to "wear and tear" related openings, he was not postured to opine as to the location of the latent openings, much less the cause of the latent openings, or the reasonable, necessary and related repairs associated therewith.  Simply put, he did not, and could not, contest that the "top to bottom" water damages that were obvious, did not serve to create a constructive total loss as opined by all three of the Plaintiffs' experts by way of their trial testimony, as well as, their affidavits that counsel for the Defendant chose to voluntarily enter into evidence for the Jury's consideration. **[D.E. 192]** and **[D.E. 203]**.

(d.) The Defendant's only other expert, Mr. Mitchell, was not a licensed contractor or engineer, and admittedly was not qualified and licensed to independently render any expert opinion as to cause, scope and value of repair.  Moreover, he attested that in conjunction with Mr. Philmon, the scope of his retention was to account for the costs of performing repairs to the roofing system as opined by Mr. Philmon as being related to patently visible wind related damages that arose as a consequence of Hurricane Irma.

(e.) Although the Plaintiffs called as a witness in their case in chief the Defendant's corporate representative, Mrs. Corbett, the Defendant voluntarily chose not to cross-examine or otherwise call Mrs. Corbett to testify in defense of the Plaintiffs' claim. That said, and on direct examination, Mrs. Corbett attested that an insurer, who by extension performs per the contract of insurance by way of adjuster, relied upon her to gather the necessary experts to determine whether there were any excluded causes or claims presented. Notwithstanding these predicated considerations and her obligations as an

adjuster and corporate representative at trial, Mrs. Corbett was unable to articulate which causes or claims were genuinely being disputed by the Defendant accordingly. When provided an opportunity to cross-examine Mrs. Corbett, the Defendant's counsel, Mrs. Levy, stated that she would call Mrs. Corbett when presenting her case. The promise proved hollow, and the record clearly reflects that the Defendant's corporate representative was admittedly unable to specify which excluded causes were being asserted as having specific and substantive application to the damages evidenced by the Plaintiffs. Thereby and otherwise, the Defendant was unable to evidence in any meaningful, specific and substantive form that any of the water damages that its own expert (who Mrs. Corbett attested she was solely relying upon) admitted were from top to bottom of the 164,000 square feet property were excluded. Most significantly however in relation to whether the Plaintiffs are entitled to a judgement in an amount that equates to the Policy limits and "Agreed Value" **[D.E. 29-1]** of $15,512,500, the Defendant did not present any evidence to support a conclusion that the admitted to "top to bottom" water damages were preexisting, excluded, or subject to being remedied for a lesser amount than those attested to by the Plaintiffs' experts as so after collectively expending approximately 400 hours inspecting and accounting for a diagnostic assessments which substantiated same in objective and dispositive form.

(f.) Without being impeached in any substantive or meaningful form, the Plaintiffs' corporate representative, Mr. Kirschner, attested that the Insured Structures were purchased for 9 million dollars in 2013, and thereafter approximately 9 million dollars were expended in improvements. Moreover, that he could affirm based on his own personal knowledge and as CFO for the Plaintiffs, that the Insured Structures were duly maintained and repaired in advance of the subject loss that forced the Plaintiffs' to

    surrender ownership once it was confirmed that the water damages pervasively developed throughout the Insured Structures after the subject loss.

4. Per the record evidence, coupled with the issues of fact and law that govern this dispute, the undisputed evidence served to fully support the Jury's findings that the Defendant did not meet the essential elements of any defense.  Point in fact, and to the extent that there was exceptionally limited testimony or evidence to support any defense that would even approach an amount of damages that fell below the Agreed Value provision under the Policy, the Defendant failed to present a singular alternative scope or valuation of repair in relation to the water damages that admittedly consumed the Insured Structures. Rather, and presumably hoping to draw confusion and conflation on an all or nothing basis, the Defendant relied upon monolithic, broad brush, self-serving and shotgun assertion of causation defenses in relation to a massive structure that in closing its counsel attempted to persuade the Jury into believing that the undisputed water damages from top to bottom were due to nothing more than the fact that the building was just "old" and happened to develop systemic failures throughout as a consequence thereof.

5. Considering the fact that the Insured Structures were purchased for 9 million dollars, that there were 9 million dollars of improvements, and that the Defendant argued to the jury in opening statements that the Plaintiffs did not in fact sustain damages since they were able to sell the Insured Structures for 10 million dollars (which served to invite error and force the Plaintiffs' counsel into a position of addressing the sale and the buyer's assignment interest during the Plaintiffs' corporate representative's testimony), the Jury may have very well been improperly influenced into awarding an amount that corresponded with the purchase price or price of improvements.  Irrespective, and undeniably, the evidence presented at trial served to unequivocally establish that: (1.) water damages had fully consumed the

Insured Structures; (2.) the Defendant did not meet its burden of establishing that the top to bottom water damages were in a meaningful form preexisting or related to a specified excluded cause of loss; and (3.) that the Defendant did not provide any evidence to establish that the Plaintiffs' three experts were incorrect in concluding that the most efficient and economic means of repair provided for the demolition of the Insured Structures which were insured per an "Agreed Value" provision, which states as follows:

> **G. Optional Coverages**
> If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.
> 1. **Agreed Value**
>    a. The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears the Agreed Value shown for it in the Declarations.
>    b. If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.
>    c. The terms of this Optional Coverage apply only to loss or damage that occurs:
>       (1) On or after the effective date of this Optional Coverage; and
>       (2) Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.
>
> *See CP 00 10 06 07 page 14 of 15.* **[D.E. 29-1]**. *See also* Agreed Value as provided for in the referenced declarations page **[D.E. 29-1]**.

6. As such, the Plaintiffs request that the Court invokes its gatekeeper role of conforming the judgment in its favor in accordance with the Policy and competent evidence presented at trial, and in so doing, enters a judgment in the amount of $15,512,500, and pursuant to Fla. Stat. Secs. 627.71031 and 55.03, awards prejudgment interest from the date that notice of the claim was provided to the Defendant on October 10, 2017 **[D.E. 160-1]**.

**MEMORANDUM OF LAW**

**I.        Plaintiffs' and Defendant's burden of proof per the "all-risk" Policy**

Per governing law and by the plain language of the Policy, a "Covered Peril" is any direct physical loss to property during the Policy period. *See Phoenix Insurance Co. v. Branch*, 234 So.2d 396 (Fla. 4th DCA 1970) ("Recovery under an 'all risks' policy generally extends to all losses not resulting from misconduct or fraud unless the policy contains a specific provision expressly excluding the loss from coverage. Once the insured establishes a loss apparently within the terms of an "all risks" policy, the burden shifts to the insurer to prove that the loss arose from a cause which is excepted*."); Egan v. Washington General Insurance Corp.,* 240 So.2d 875 (Fla. 4th DCA 1970) ("The general rule of evidence is that a plaintiff seeking to recover under an 'all risks' policy has the burden of proving that (1) the policy was in full force and effect; (2) a loss occurred to the insured's property during the effective policy period."); *B & S Assocs., Inc. v. Indem. Cas. & Prop.,* Ltd., 641 So. 2d 436, 437 (Fla. 4th DCA 1994). ("Coverage should be extended under an all-risks insurance policy, even when the cause of the damage is unknown.").

To draw further clarity of the exceptionally simplistic legal and factual issue in question which is governed by a legion of binding precedent which includes the Florida Supreme Court's holding in *Fayad v. Clarendon National Insurance Company*, 899 So.2d 1082, 1089 (Fla. 2005), per an "all-risk" policy such as the one in question the insured meets the initial burden of proof by way of nothing more than evidencing that the physical damages to the insured property arose during the policy period. In other words, and irrespective of whether the insured's honest and subjective beliefs prove accurate at trial, it is not the legal obligation of an insured (who is typically a layperson that is not postured to provide a qualified expert opinion) per an "all-risk" Policy to prove the actual

cause of the physical damages that are otherwise evidenced to have occurred at some point during contracted for policy period that so provides. As such, and once the insured meets the stated burden of proof, the insurer who wishes to challenge coverage must then evidence that the resulting damages were in part, or in whole, the result of one or more excluded causes of loss (i.e. wear and tear, latent defect, construction defect, etc.) that follow the general coverage provision which provides coverage for all losses and expenses that arise from direct physical loss to property during the Policy period.

To draw further reference to the holding in *Fayad*, the Florida Supreme Court was confronted with the issue of whether an exclusion for "earth movement" served to bar coverage for losses and damages arising from earth movement in association with blasting activities in the surrounding areas. The blasting activities themselves were not an excluded cause of loss. Nonetheless, and even though the blasting activities were alleged to be the catalyst to the ensuing earth movement, the insurer on appeal insisted that the trial court had not erred in finding that the cause of loss was excluded. In rejecting the insurer's argument, the Florida Supreme Court further reasoned and explained the considerations at hand as follows.

> The specific type of insurance policy involved in this case is, as in *Castillo* and *Phoenix*, an all-risk policy. Unless the policy expressly excludes the loss from coverage, this type of policy provides coverage for all fortuitous loss or damage other than that resulting from willful misconduct or fraudulent acts. *See Sun Ins. Office, Ltd. v. Clay*, 133 So. 2d 735, 739 (Fla. 1961); *Wallach v. Rosenberg*, 527 So. 2d 1386, 1388 (Fla. 3d DCA 1988) (*quoting Phoenix*, 234 So. 2d at 398); *Jane Massey [*1086] Draper, Annotation, Coverage Under All-Risk Insurance,* 30 A.L.R. 5th 170, 170 (2004). Although the term "all-risk" is afforded a broad, comprehensive meaning, *see Wallach*, 527 So. 2d at 1388, an "all-risk" policy is not an "all loss" policy, and thus does not extend coverage for every conceivable loss.
>
> In deciding whether an all-risk policy [**8] excludes coverage for an insured's claimed damages, we are guided by well-established principles of insurance contract interpretation. We begin with the guiding principle that insurance

10

contracts are construed in accordance with "the plain language of the policy as bargained for by the parties." *Auto-Owners Ins. Co. v. Anderson,* 756 So. 2d 29, 33 (Fla. 2000) (*quoting Prudential Prop. & Cas. Ins. Co. v. Swindal,* 622 So. 2d 467, 470 (Fla. 1993)) (alteration in original). However, if the salient policy language is susceptible to two reasonable interpretations, one providing coverage and the other excluding coverage, the policy is considered ambiguous. *See Anderson*, 756 So. 2d at 34; Swire Pac. *Holdings, Inc. v. Zurich Ins. Co.,* 845 So. 2d 161, 165 (Fla. 2003). Ambiguous coverage provisions are construed strictly against the insurer that drafted the policy and liberally in favor of the insured. *See Anderson,* 756 So. 2d at 34; State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So. 2d 1072, 1076 (Fla. 1998*); Deni Assocs. of Florida, Inc. v. State Farm Fire & Cas. Ins. Co*., 711 So. 2d 1135, 1138 (Fla. 1998). [**9] Further, ambiguous "exclusionary clauses are construed even more strictly against the insurer than coverage clauses." *Anderson,* 756 So. 2d at 34; *see also Demshar v. AAA Con Auto Transport, Inc.,* 337 So. 2d 963, 965 (Fla. 1976) ("Exclusionary clauses in liability insurance policies are always strictly construed."). Thus, the insurer is held responsible for clearly setting forth what damages are excluded from coverage under the terms of the policy. . . .

In line with the majority of courts, we conclude that absent specific language in the policy to the contrary, an earth movement exclusion is limited to damage caused by natural phenomena. This construction is required by principles of insurance contract interpretation and is consistent with the plain meaning of the term "earth movement." See Webster's Third New International Dictionary 715 (1971) (stating that "earth movement" means the "differential movement of the earth's crust: elevation or subsidence of the land"), [**14] *quoted in Sentinel Assocs. v. American Mfrs. Mut. Ins. Co.,* 804 F. Supp. 815, 818 n.2 (E.D. Va. 1992) . . . .

Even if we were to conclude that our interpretation and Clarendon's interpretation are equally reasonable, this conclusion would render the provision ambiguous and this ambiguity would be resolved in favor of coverage. This result is consistent with the dual principles that ambiguous provisions in insurance contracts are strictly construed against the insurer and that ambiguous exclusionary clauses are construed even more strictly against the insurer than coverage clauses. *See Anderson*, 756 So. 2d at 34.

Clarendon has failed to demonstrate that its limited earth movement exclusionary clause encompasses blasting and other similar man-made events. The purpose of an all-risk policy is to protect against all risks except those expressly excluded. Damage caused by blasting is not expressly excluded from coverage in Clarendon's policy. Construing the exclusion strictly against Clarendon as the drafter of [**17] the all-risk insurance policy, we conclude that blasting is not encompassed within the earth movement exclusion. We rely not only on the actual language used in Clarendon's definition of earth movement, but also on the fact that Clarendon chose not to utilize language specifically excluding damage resulting from earth movement regardless of its

11

cause.

II.     **Whether the Plaintiffs are entitled to a directed verdict as to damages**

Being that the Plaintiffs' and Defendant agreed that the vast majority of the Insured Structures were consumed by ensuing moisture damages that by their very nature are understood by even a layperson as toxic, corrosive and unsustainable in relation to their continued operations as an assisted living facility that houses the elderly and sick, there was no meaningful dispute that a complete rebuild or refinish of the Insured Structures was necessary in order to return them to a pre-loss condition. Since the hollow core concrete walls, catwalks, and floors were serving as a reservoir for the ensuing water damages at issue, coupled with the fact that were an exhaustive number of latent openings that were serving to cause the conditions in question, the Plaintiffs' retained engineer and licensed contractor opined that there was no economic value to be drawn from attempting to partially repair any of the 5 buildings that make up the Insured Structures. The Defendant in turn did not present any evidence to the contrary, it would defy reason and common sense to suggest that the Insured Structures could be torn down and rebuilt at an amount that did not exceed the contracted for insured valuation of $15,512,500. Point in fact, when considering that the Insured Structures totaled 164,000 square feet, the tear down and rebuild cost per square foot would have to be less than $95.00 per square foot in order for there to be a genuine question of fact as to whether the cost of repair was less than the Agreed Value of the Insured Structures per the Policy provision.

Whether in the form of a directed verdict or motion for summary judgment, it is established law that a litigant is entitled to judgment as a matter of law when damages as evidenced by the Plaintiff are not disputed by way of competent evidence. In the case at hand, there were two components of the damages being claimed by the Plaintiffs. The first component entailed wind damages which caused patent and latent openings within (*inter alia*) the roofing system,

structural walls and floors, intersect points between windows, doors and air conditioning systems which intersected with the exterior walls. In said regard, the only countervailing evidence presented by way of the Defendant's experts related to the roofing system and a nominal account of roofing and interior areas of the Insured Structures that may have been in concurring form damaged as a consequence of Hurricane Irma and wear and tear.  That said, they did not in any substantive form create an issue of fact in relation to whether piece meal repairs would in fact be a less expensive means of rehabilitating an assisted living facility that by all accounts, including hundreds of hours of diagnostic testing on the part of the Plaintiffs' experts, was engulfed in toxic and corrosive ensuing moisture conditions throughout. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 60911 (E.D. La., Apr. 21, 2017) (finding that as it related to class members the Court could reasonably assess the minimum cost of repair on a square foot basis); Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co., 2009 WL 1046354 (M.D. Fla., May 27, 2009) (As to hurricane damages that the insured's experts attested as resulting in a constructive total loss, the Court held the visible observations of the insured's experts was sufficient, and that in relation to any apportionment of damages that were not covered in relation to the damages that caused the alleged total loss, the Jury was free to account for same*); See Hanna v. Ward Mfg.*, 723 F. App'x 647, 651 (11th Cir. 2018) (noting that although plaintiff questioned reliability of defendant's expert's methodology, plaintiffs' own expert relied on the same indicia [*33] and used same criteria in making his own assessments. In such cases, courts have typically concluded that because experts from the same industry both relied on the same or similar methodology, that the particular methodology enjoys at least some level of acceptance in that industry); *citing Portis v. State Farm Fire*, No. 1:15-CV-3949-MHC, 2017 WL 3499873, *8 (N.D. Ga. April 11, 2017).  Hence, and as a matter of law that is to be adjudicated by this Court, the Agreed Value provision of the Policy

**[D.E. 29-1]** governs and the Defendant is bound thereby. *See Infinity Yachts v. St. Paul Fire & Insurance Co.*, 655 So. 2d 1259 (Fla. 4th DCA 1995) (in affirming the trial court's summary adjudication of damages as a matter of law, holding that any ambiguity in the insured policy's fixed value of an insured vessel was to be construed against the insurer who had drafted the contract for the fixed amount of damages upon a complete loss). This conclusion is further supported by the Jury's finding of $9,280,000 in damages, which on its face, evidences that in fact the Jury concluded that there was catastrophic damage for which the Defendant's experts did not provide any course of repair that ran alternative to the Plaintiffs' three experts' opinions or findings that the vast amount of damage served to qualify a constructive total loss. Moreover, and once the Plaintiffs' experts' undisputed findings of hundreds of latent findings throughout the Insured Structures are accepted, or the Defendant's expert's related findings of water damages top to bottom are accepted in conjunction with the fact that the Jury did not find in favor of the Defendant as to a singular affirmative defense, there is no evidence that the Defendant can identify in opposition to its obligation to issue payment in accordance with the Policy's "Agreed Value" provision in association with a constructive total loss. In other words, it was possible that only a certain percentage, number of buildings, or areas were concluded by the Jury as being subject to demolition and reconstruction, this conclusion runs contrary to the Defendant's own expert's testimony which confirmed that the water damages were pervasive throughout the Insured Structures, and that he could not identify in any meaningful form to what degree if any they preexisted the subject loss or were due to a specify cause that was excluded under the Policy.

WHEREFORE, the Plaintiffs, AM Grand Court Lakes and AM 280 Sierra Drive, respectfully request that the Court affirms the Jury Verdict as to coverage, grants their directed verdict for damages in the corresponding amount of $15,512,500, and thereby enters final

judgment in favor of the Plaintiffs for the stated amount for which prejudgment interest is to be added from the date that the claim was reported on October 10, 2017. See Fla. Stat. Secs. 627.71031 and 55.03. Alternatively, the Plaintiffs respectfully request that the Court enters Judgment in accordance with its previously filed Rule 54 Motion of record **[D.E. 205]**.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically delivered via the CM/ECF filing portal on December 9, 2019, on all counsel or parties of record on the Service List below.

        **FONT & NELSON PLLC**
        *Attorneys for Plaintiffs*
        200 S. Andrews Avenue, Suite 501
        Fort Lauderdale, FL 33301
        Tel: (954) 248-2920; Fax: (954) 248-2134
        Designated E-mail: pleadings@fontnelson.com
        Secondary E-mail: jmartin@fontnelson.com
        Tertiary E-mail: srandolph@fontnelson.com

BY:    /s/ *Jose P. Font*
          **JOSE P. FONT, ESQ.**
          Florida Bar #: 0738719
          **JAIME MARTIN, ESQ.**
          Florida Bar #: 110616
          **SONYA P. RANDOLPH, ESQ.**
          Florida Bar # 1007710

## SERVICE LIST

Lauren D. Levy, Esq.
lauren@levylawgroup.com
Levy Law Group
3399 Ponce De Leon Boulevard
Suite 202
Coral Gables, FL 33134
Telephone: (305) 444-1500
Facsimile: (305) 503-9295
Attorney for Defendant

Paula Levy, Esq.
paula@levylawgroup.com
Levy Law Group
3399 Ponce De Leon Boulevard
Suite 202
Coral Gables, FL 33134
Telephone: (305) 444-1500
Facsimile: (305) 503-9295
Attorney for Defendant